UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BONNIE LEE SCHMIDT,

      Plaintiff,

v.                                                Case No. 14-C-115

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

## DECISION AND ORDER

This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff Bonnie Lee Schmidt's application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Schmidt challenges the decision of the Administrative Law Judge (ALJ) finding that she is not disabled and argues the ALJ erred by failing to give the proper weight to the medical opinion evidence in the record, and by failing to include all limitations established by the evidence in the residual functional capacity (RFC) determination. For the reasons below, the Commissioner's decision will be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g).

## BACKGROUND

Plaintiff Bonnie Lee Schmidt filed an application for a period of disability and disability insurance benefits on September 23, 2010, alleging an onset date of August 15, 2009. She claimed she was unable to work because of various physical and mental impairments, including panic disorder

with agoraphobia, depression, learning problems, sciatica, and knee problems. (Tr. 154.) Her application was denied initially and on reconsideration, and she requested a hearing.

On September 12, 2012, Administrative Law Judge (ALJ) Mary Ann Lundermann conducted a hearing during which Schmidt, who was represented by counsel, and a vocational expert (VE) testified. Following the hearing, the ALJ issued a written decision in which she determined Schmidt was not disabled. (*See* Tr. 11–23.) The ALJ found Schmidt met the insured status requirements and had not engaged in substantial gainful activity since the alleged onset date, and that Schmidt had the following severe impairments: anxiety disorders; affective disorders; learning disorder; morbid obesity; right knee impairment; and degenerative disc disease. (Tr. 13.) At step three of the sequential evaluation process, the ALJ found Schmidt's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpt. P, App. 1 (Tr. 14–16). The ALJ then determined Schmidt had the RFC:

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to simple, repetitive, unskilled work. Her work environment should have no co-workers in close proximity; no contact with the public; and only limited contact with supervisors at the beginning and end of the shift and 1-3 times in between.

(Tr. 16.) Although the ALJ found Schmidt was unable to perform any past relevant work with this RFC, considering Schmidt's age (38), education, work experience, RFC and the testimony of the vocational expert, the ALJ found that there were jobs that existed in significant numbers in the national economy that Schimdt could perform. (Tr. 22–23.)

Accordingly, based on these findings, the ALJ concluded Schmidt had not been under a disability from the alleged onset date of August 15, 2009 to the date of the decision, November 16, 2012. This became the final decision of the Commissioner when the Appeals Council denied

Schmidt's request for review on December 3, 2013. Schmidt then commenced this action for judicial review.

As the Commissioner points out, Schmidt's challenge on review is a limited one. She does not challenge the ALJ's determination at step three of the sequential analysis that her mental impairments do not meet or medically equal any listed impairment. She does not challenge the ALJ's determination of her physical residual functional capacity. She does not challenge the ALJ's credibility finding. She does not dispute that there are a significant number of jobs she can perform, assuming the RFC determined by the ALJ is correct. The sole issue Schmidt raises is the manner in which the ALJ weighed the medical opinions relating to her mental impairments. While she also challenges the ALJ's RFC determination, she concedes that this is simply a different form of her claim that the ALJ did not properly evaluate the medical opinions relating to her mental impairments.

At the hearing, in explaining why she was unable to work, Schmidt described her mental condition as follows:

> I have panic disorder very, very bad. On good days I only have two panic attacks a day. And when it's bad, bad they last up to an hour where I have intense fear. I've been to emergency room numerous times thinking I was dying, having a heart attack, and I go and they're telling me it's just a panic attack. So -- and I got agoraphobia with that, so I'm afraid to leave home because I'm afraid of having a panic attack and what will happen if I pass out and they're not going to know who I am or -- and then with that I got the depression. I mean, just out of the blue I can just be sitting there and I'm so sad, and I just want to cry, and I don't want to be here anymore and -- and that's pretty much with the mental.

(Tr. 42–43.) The medical opinions she claims the ALJ failed to properly assess are discussed below.

3

## STANDARD OF REVIEW

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

**A. Assessing Medical Opinions**

The ALJ is required to evaluate every medical opinion received into the record, regardless of its source. 20 C.F.R. § 404.1527(c). The opinion of a treating physician on the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." § 404.1527(c)(2). This is what is known as the "treating physician rule." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Where the ALJ chooses to reject a treating physician's opinion, he must provide a sound explanation for the rejection. *Id.* Even if there are sound reasons for refusing to give a treating physician's opinion controlling weight, the ALJ must still determine what value the assessment does merit, just like those of other non-treating physicians. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). In addition to whether the physician has treated the claimant, the factors that the ALJ should consider in evaluating medical opinions include whether the source has examined the claimant, the length of treatment and frequency of examination, nature and extent of the treatment relationship, the type of support offered for the opinion, consistency of the opinion with the record as a whole, and area of specialization. 20 C.F.R. § 404.1527(c). Schmidt contends that the ALJ failed to properly apply these principles to the opinions of three medical sources: Dr. Koti Mannem, a treating psychiatrist; Dr. Dennis Elmergreen, an examining consultative psychologist; and Dr. Jack Spear, a non-examining state agency psychologist.

**B. Dr. Mannem**

Schmidt first argues that the ALJ erred in failing to specify what weight she gave Dr. Mannem's opinion that "she was unable to work because of panic disorder with agoraphobia, which

5

caused her to be afraid of leaving her house." (Pl.'s Br. 5, ECF No12.) The ALJ simply said that she gave "some weight" to Dr. Mannem's opinion without further defining what "some" means. Schmidt contends, the statement is essentially meaningless. (*Id.* at 6.) Schmidt also contends the ALJ discredited Dr. Mannem's opinion as "not evidenced in his medical records or in the file as a whole," but did not state what specific evidence was inconsistent. (*Id.*) (quoting Tr. 19). I disagree.

The ALJ provided an extensive discussion of Dr. Mannem's records in her decision. It appears that Dr. Mannem first saw Schmidt in connection with her panic disorder in August 2011. (Tr. 328.) As recounted by the ALJ, Dr. Mannem noted that Schmidt had been treated by a nurse practitioner at the Tigerton Clinic for the past nine years. She had tried various medications, but not to the full dosages, and had not tried relaxation techniques or desensitization. Schmidt told Dr. Mannem she had panic attacks when she went out, as well as when she stayed home. Yet, Dr. Mannem noted that she managed to keep her appointments and never cancelled one due to a panic attack. On examination, Dr. Mannem found her to be alert and fully oriented with an anxious mood and appropriate affect. The ALJ noted that Dr. Mannem diagnosed her with panic disorder with agoraphobia and dysthymia and assigned her a GAF of 60–65 for mild-to-moderate symptoms. He increased her Zoloft, discontinued her Xanax, and added Ativan. He also recommended counseling.

The ALJ recounted that at a follow-up visit in September 2011, Dr. Mannem noted Schmidt was doing well on her medication. (Tr. 18.) According to his report, she reported that the medications "made a big positive difference. She is no longer feeling anxious. She is able to sleep through the night. Not having any major panic attacks." (Tr. 327.) The only complaint Schmidt

had was that her sex drive had gone "completely down." In response, Dr. Mannem reduced the Zoloft to see if it would take care of the sexual side effects without losing control of the anxiety. (Tr. 328.)

As recounted by the ALJ, when Dr. Mannem saw Schmidt again in November, her sexual interest had returned, but she was "crabby and anxious." (Tr. 18.) Dr. Mannem instructed Schmidt to taper off Zoloft and started her on Wellbutrin. When he next saw her in January 2012, she was doing well and had no sexual or other side effects. She reported that her anxiety was controlled most of the time but she still had "occasional attacks." (Tr. 326.) Reviewing Dr. Mannem's records, the ALJ noted that Schmidt failed to show for a psychiatric visit in April 2012, but was seen later that month and her symptoms were "under decent control at that time." She again failed to show for psychiatric visits in July and August, 2012, and her hearing proceeded the next month. Based on this record, recounted in detail by the ALJ, she concluded:

> Overall, this evidence shows improvement in the claimant's condition with medication. With continued compliance with medications and attendance at scheduled counseling sessions, the claimant should continue to do fairly well. Nevertheless, this evidence is accommodated by a restriction to simple, repetitive, unskilled work with limited contact with co-workers, supervisors, and the public.

(Tr. 18.)

Schmidt's argument focuses on a November 21, 2011, questionnaire that appears in Schmidt's record but does not even identify her as the patient whose condition is described. (Tr. 217–18.) Mannem checked the spaces on the form indicating the patient had generalized persistent anxiety accompanied by apprehensive expectation and that she experienced recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. (Tr. 217.) In the space

provided for the physician to write remarks, Mannem wrote: "client has been diagnosed with panic disorder with agoraphobia. Afraid of leaving home. This prevents her from taking jobs." (Tr. 218.) It is this opinion that Schmidt claims the ALJ failed to properly evaluate.

Given the detailed description of Dr. Mannem's record of treatment, the ALJ's rejection of his conclusion that Schmidt could not hold a job was reasonable. Assuming the form even relates to Schmidt, it was completed in November 2011, before the significant improvement Dr. Mannem was able to achieve with medication occurred. As the ALJ noted, the severity of symptom indicated was not evidence in his medical records or in the file as a whole. (Tr. 19.) Earlier analysis by the ALJ also supports her assessment. For example, the ALJ noted that Schmidt claimed to suffer panic attacks two to three times a day and she testified that she had been to emergency rooms numerous times for her condition. (Tr. 17, 43.) The ALJ noted, however, that the documentation of emergency room treatment does not confirm that she was seen for panic attacks but for vaginal bleeding. (Tr. 17.) Primary care notes, the ALJ observed, "reveal mostly routine visits for physical and mental problems." (*Id.*) For all of these reasons, the ALJ's rejection of Dr. Mannem's opinion that Schmidt could not hold a job must stand.

Schmidt's additional argument that the ALJ failed to describe more precisely the amount of weight he gave Dr. Mannem's report likewise fails. It is clear from her opinion that the ALJ credited Dr. Mannem's findings that Schmidt suffered from panic disorder and that her condition significantly improved with medication. To the extent Schmidt is asking for more specificity, it would appear that she is taking a metaphor too far. As the court has previously noted:

> [O]pinions do not have weight; they consist of abstract ideas. We talk of the weight given an opinion as a way of describing how convincing it is. The kind of precision

8

that measuring a body's weight allows is not possible when talking about the weight of an opinion.

*Schmidt v. Colvin*, No. 13-C-174, 2014 WL 907419, at *10 (E.D. Wis. March 7, 2014).

Finally, to the extent Dr. Mannem was saying Schmidt simply cannot hold a job, the ALJ was not bound to evaluate this opinion under 20 C.F.R. § 404.1527(b). *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) ("As a final note, the Commissioner might have (but did not) argue that Dr. Wright's opinion concerning Roddy's ability to work was not the kind of 'medical opinion' that the ALJ must evaluate under 20 C.F.R. § 404.1527(b), (c)."). The agency's regulations assign the decision about ability to work to the Commissioner. See 20 C.F.R. § 404.1527(d)(1).

For the reasons set forth above, the ALJ sufficiently explained the extent to which she found Dr. Mannem's opinion credible and the reasons therefore. No more is required.

**C. Dr. Elmergreen**

Schmidt's criticism of the ALJ's treatment of the opinion of Dr. Elmergreen stands on firmer ground. Dr. Elmergreen performed a consultative mental status and intellectual evaluation of Schmidt in April 2011, before she began treatment with Dr. Mannem. Based upon his evaluation and testing, Dr. Elmergreen described Schmidt's work capacity as follows:

> Bonnie's ability to understand, remember, and carry out simple instructions appeared mildly impaired; respond appropriately to supervisors and coworkers moderate to markedly impaired; maintaining concentration, attention, and work pace moderate to markedly impaired, and withstand routine work stressors and· adapt to changes moderately impaired.

(Tr. 274.) After synthesizing Dr. Elmergreen's findings and conclusions, the ALJ simply states: "This evidence is accommodated by limiting claimant to simple, repetitive, unskilled work with no

9

co-workers in close proximity and limited contact with supervisors at the beginning and end of the shift and 1–3 times in between." (Tr. 20.) This is not enough.

It appears that the ALJ accepted Dr. Elmergreen's assessment of Schmidt's work capacity. At least there is no suggestion that she has rejected it. The problem is that the ALJ fails to explain how the limitations described by Dr. Elmergreen translate into the RFC she has found. There is no explanation of how a RFC of simple, repetitive unskilled work with limited contact with others accommodates a moderate to markedly impaired ability to maintain concentration, attention and work pace. The Seventh Circuit has clearly stated it does not. *See Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) ("The Commissioner asserts that the ALJ accounted for Stewart's limitations of concentration, persistence, and pace by restricting the inquiry to simple, routine tasks that do not require constant interactions with coworkers or the general public. We have rejected the very same contention before. In *Young v. Barnhart*, we held that a hypothetical with exactly those specifications did not adequately account for the plaintiff's medical limitations, including an 'impairment in concentration.' 362 F.3d at 1004."). Nor is this a case where the medical expert has translated the non-exertional limitations of a mental impairment into specific RFC. *See, e.g., Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir.2002). There is no explanation for how a moderate to markedly, or even only a moderate limitation in one's capacity to maintain concentration, attention and work pace is accounted for by a RFC of simple, repetitive unskilled work with limited social contact.

Part of the problem is the confusing report of the consultative examiner. Moderate to marked limitations would appear significant, but no definition or guidance is provided as to what the examiner means. If the SSA is going to pay consultative examiners to perform evaluations, it might

10

consider insisting that the reports provided by its consultants contain sufficient clarity to allow the ALJ to benefit from them. The Agency's own rules require non-examining consultants to provide a narrative summary of the claimant's RFC after completing a worksheet checklist. *See Kraus v. Colvin*, No. 13-C-578, 2014 WL 1689717, *12–17 (E.D. Wis. Apr. 29, 2014) (discussing the special technique in detail and concluding that the ALJ reasonably relied on the state agency physician's assessment). Consultative examiners should be required to do the same, and if they fail to do so, the report should be sent back to them until they do.

In any event, the ALJ's assessment of Dr. Elmergreen's opinion does not allow the reviewing court to follow her reasoning. The case will be remanded for further explanation or development of the record.

**D. Dr. Spear**

The ALJ's treatment of Dr. Spear's opinion also requires clarification. Much of Schmidt's criticism of the ALJ's assessment of Dr. Spear's opinion mirror's her criticism of the ALJ's treatment of Dr. Elmergreen. She contends that he erred in failing to specifically incorporate all of the moderate limitations noted on the Summary Conclusions section of the Mental Residual Functional Capacity (MRFC) form used by the SSA into his RFC. But as other courts and the SSA's own Program Operations Manual System (POMS) explain, the Summary Conclusions section "is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." See POMS, DI 24510.060 (emphasis in original) (available at https:// secure.ssa.gov/apps10/poms.nsf.); *see also Smith v. Comm'r of Social Sec.*, 631 F.3d 632, 637 (3d Cir. 2010) ("Because Smith cannot rely on the worksheet component of the Mental Residual Functional Capacity Assessment to contend that the

11

hypothetical question was deficient, his argument is without merit as it pertains to Dr. Tan and Dr. Graff."). Thus, the failure of the ALJ to incorporate limitations noted in the Summary Conclusion section was not error. *Kraus v. Colvin*, 2014 WL 1689717 at *16.

It is in the narrative section of the MRFC that a consultative reviewer is to state the claimant's RFC. The instructions for the MRFC state that "[t]he degree and extent of the capacity or limitation must be described in narrative format in Section III." POMS, DI 24510.063. Here, Dr. Spear described Schmidt's MRFC in Section III of his report as follows:

> She should avoid jobs that require public contact. She does have the capacity to do unskilled work in a low stress environment. Physically she has no severe impairment.

(Tr. 292.)

Again, the ALJ appears to have accepted Dr. Spears opinion. At least she did not express any disagreement. The ALJ then states: "I have taken the above [Dr. Spear's] assessment into account in restricting the claimant to simple, repetitive, unskilled work with no co-workers in close proximity, no contact with the public and limited contact with her supervisors." (Tr. 20–21.) Unfortunately, there is nothing in the ALJ's RFC that accounts for the "low stress" limitation that Dr. Spear included in his RFC. Simple, repetitive, unskilled work can require fast paced and high stress work. *See Swanagin v. Commissioner of Social Sec.*, No. 2-13-CV-434, 2014 WL 4181712, *10 (S.D. Ohio Aug. 21, 2014) ("She is further limited to simple, unskilled, and repetitive work in positions without high stress, fast-paced work, or strict production quotas."). Indeed, some of the machine operating jobs the VE identified based on the RFC the ALJ identified may require just such fast paced work. (Tr. 22.)

The ALJ must either explain why she omitted the "low stress" limitation from her RFC, or explain how her RFC accommodates that limitation. She did neither here. Accordingly, for this reason also the case must be remanded.

## CONCLUSION

For all of these reasons, the Commissioner's decision is **REVERSED AND REMANDED** pursuant to 42 U.S.C. § 405(g) (sentence four) for further proceedings consistent with this decision.

**SO ORDERED** this 20th day of November, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court